# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00427-CV

**Ryan Sylvia and Shannon Sylvia, Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
## NO. 231,258-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Ryan and Shannon Sylvia appeal from a final order terminating parental rights. In two issues on appeal, Ryan and Shannon assert that the evidence is legally and factually insufficient to support termination and that the district court abused its discretion in admitting evidence regarding Ryan's childhood. We will affirm the termination order.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) filed a petition seeking to terminate the parental rights of Ryan and Shannon Sylvia to their three daughters, three-year-old R.S., two-year-old S.S., and one-year-old T.S. Also parties to the termination suit were two older children of Shannon's (and stepchildren of Ryan's), ten-year-old K.W., who was

Shannon's daughter from a prior relationship with Jeremiah Warner;[1] and sixteen-year-old R.B., who was Shannon's daughter from a prior relationship with Alexander Tapia. In addition to seeking termination of the Sylvias' parental rights to the three children of their relationship, the Department sought to terminate Shannon's parental rights to K.W. but not R.B.

The termination suit was based on allegations that Ryan had sexually abused and/or exposed himself to his stepdaughters on multiple occasions and that Shannon knew or had reason to know of Ryan's abusive behavior but did nothing to stop it. The suit was tried to a jury. The Department called several witnesses to testify, including Ryan and Shannon; R.B. and K.W (Shannon's two oldest daughters); Dr. Michael Campbell, a psychologist who had evaluated Ryan and Shannon; Brenda Bearden, a licensed clinical social worker who had provided therapy to Shannon; Melissa Reese, a friend of the Sylvias to whom K.W. had made an initial outcry alleging abuse; and Lurene Tapia, the conservatorship caseworker for the children. Ryan and Shannon also called several witnesses to testify, including Dr. Gregg Hupp, a psychologist who had examined Ryan and Shannon; Ryan's sister, 17-year-old S.G.; Ryan's mother, Lori Gildea; and John Bennyhoff, an 18-year-old son of Shannon and stepson of Ryan. We will review the testimony of these and other witnesses in detail when we analyze the sufficiency of the evidence supporting termination.

At the conclusion of trial, the jury found by clear and convincing evidence that both Ryan and Shannon's parental rights to all three of their children should be terminated and

---

[1] In the same proceeding, Warner's parental rights to K.W. were also terminated. Warner did not appear at trial and has not appealed the termination order.

that Shannon's parental rights to K.W. should also be terminated. The district court rendered a final order terminating their parental rights and naming the Department sole managing conservator of the children. This appeal followed.

## ANALYSIS

In their first issue, Ryan and Shannon assert that the evidence is legally and factually insufficient to support termination of their parental rights. In their second issue, they contend that the admission of certain evidence regarding Ryan's childhood history "caused unfair prejudice and prevented a fair trial."

**Evidentiary sufficiency**

We will first address the sufficiency of the evidence supporting termination. We will assume without deciding that the challenged evidence regarding Ryan's childhood history, which we discuss later, was inadmissible and, therefore, will not consider that evidence in our sufficiency analysis. *See North Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90, 97 (Tex. App.—Dallas 1995, writ denied) (refusing to consider inadmissible evidence in determining sufficiency of evidence); *see also In re L.A.C.*, No. 02-08-00324-CV, 2009 Tex. App. LEXIS 9876, at *3 (Tex. App.—Fort Worth Dec. 10, 2009, no pet.) (mem. op.) (in parental termination case, excluding allegedly inadmissible evidence from sufficiency review).

*Standard and scope of review*

A court may terminate parental rights based on findings by clear and convincing evidence that (1) a parent has committed any of several statutory bases for termination and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2009); *Holley v. Adams*, 544 S.W.2d 367, 370-72 (Tex. 1976). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980).

In a legal sufficiency review of a finding terminating parental rights, an appellate court reviews all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal sufficiency review, a reviewing court must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *Id*. An appellate court disregards all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id*.

In a factual sufficiency review of a finding terminating parental rights, the inquiry is whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id*. A court of appeals must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *Id*. A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could

4

not have resolved that disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

In this case, the district court submitted, and the jury found by clear and convincing evidence that Ryan, and Shannon: (1) "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children," *see* Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp. 2009); or (2) "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children." *See id.* § 161.001(1)(E). When termination is based on multiple grounds under section 161.001(1), as it was here, we must affirm the termination order if the evidence is sufficient to support any one of the grounds found by the district court. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Both subsections (D) and (E) of family code section 161.001(1) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child suffer actual physical injury. *In re A.B.*, 125 S.W.3d 769, 776-77 (Tex. App.—Texarkana 2003, pet. denied); *Doyle v. Texas Dep't of Protective and Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).

5

Subsections (D) and (E) differ in at least one respect—the source of the physical or emotional endangerment to the child. Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health, while subsection (E) requires that the cause of the endangerment be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle*, 16 S.W.3d at 395. The cause of the endangerment must be the direct result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). Endangering conduct may occur either before or after the child's birth. *See In re U.P.*, 105 S.W.3d 222, 233-34 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also In re A.S.*, 261 S.W.3d at 83. The statute does not require that conduct be directed at a child or cause actual harm. *Boyd*, 727 S.W.2d at 533. It is sufficient if the conduct endangers the emotional well-being of the child. *See In re U.P.*, 105 S.W.3d at 236. The law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to the child. *Dallas County Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ). If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct. *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied). Additionally, domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. ref'd). Without question, sexual abuse is conduct that endangers a child's physical or emotional well-being. *In re L.C.*, 145 S.W.3d 790, 796 (Tex. App.—Texarkana 2004, no pet.). Moreover, "evidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children." *In re R.W.*, 129 S.W.3d at 742. Additionally, a parent's refusal to acknowledge responsibility for the child and protect him or her from a situation that exposes the child to the risk of sexual abuse is grounds for termination of parental rights under subsection (E). *See In re L.C.*, 145 S.W.3d at 797-98; *In re J.M.C.A.*, 31 S.W.3d 692, 697-98 (Tex. App.—Houston [1st Dist.] 2000, no pet.); *Lakes v. Texas Dep't of Human Servs.*, 791 S.W.2d 214, 216 (Tex. App.—Texarkana 1990, no writ).

### Evidence considered by the jury

In this case, the evidence considered by the jury included the testimony of both R.B. and K.W. R.B. testified that Ryan would come into her bedroom early in the morning wearing only boxer shorts and with his "private area sticking out of the front." When asked if Ryan had said anything to her when this first occurred, R.B. testified, "He would—not really. He would just like stare at me. And I would be like, 'It's kind of hanging out right now.' And he would go like, 'Oh, well, it was an accident.'" According to R.B., this happened "around six" times, "when my mom would leave for work or wherever she went." Also, R.B. recalled, Ryan "was always trying to advise me on how to clean myself even though I know how." R.B. also described an incident when Ryan entered the bathroom while she was taking a shower. According to R.B., Ryan claimed that he had

7

done so because the other bathroom was occupied by K.W. However, when R.B. later asked K.W. if this was true, K.W. told her that she had not been in the other bathroom at the time. This led R.B. to conclude that "there was no reason he was supposed to be in our bathroom while I was taking a shower." When asked if she had said anything to Shannon about Ryan's behavior, R.B. testified, "I told her occasionally, like I would bring it up in conversation, but she would always say it was like an accident or he was just, you know, trying to help out and stuff."

R.B. further testified that Ryan could be violent. According to R.B., "He threw a lot of things; that was sort of his little temper tantrum" when he got angry, including throwing things directly at her when she would "talk back to him." She also explained that when her older brother, 18-year-old John Bennyhoff, lived with the family, there were often arguments between John and Ryan that would sometimes escalate into physical violence to the point that police would be dispatched to their residence.

The jury also heard a videotaped interview of R.B. with the Children's Advocacy Center, a transcript of which appears in the record. In the interview, R.B. elaborated on her allegations against Ryan:

> Well, recently, like a couple of months ago, she started like—because Mom was looking for a job, so she would leave kind of early because he worked from 11:00 at night until 7:00 in the morning, and so she would leave about 8:00 in the morning and go look for a job or whatever. So he thought it was okay to come in my room with his boxers on but with his, you know, private area hanging out. And he would like run in my room and try and wake me up and everything. I had the bottom bunk, too, and so he was like right there—so not really cool. And he did that probably about ten times. And so—my mom kept saying, oh, it was an accident, it was an accident, it was just the boxers he was wearing. And I was like, it's not an accident when he only really does it when you're not around, so—

8

R.B. stated in the video that before she was able to inform Shannon about what Ryan was doing to her, Ryan "beat [her] to the punch" and told Shannon that "it was an accident, it only happened one time." From that point on, R.B explained, her attitude toward her mother was, "you know, believe what you want to believe. He still did it . . . ." R.B. added that Shannon "doesn't really believe us much" and "really believes [Ryan] more than us." When asked why she thought this was so, R.B. opined that Shannon "thinks [Ryan]'s this really great catch" and "like the best guy in the world because they have three kids together, they're not married, and he's younger than she is, so he'll last longer."[2]

R.B. also described an instance when Ryan "would try and like sort of do like a little sex talk or something with me." The topic, according to R.B., was feminine hygiene. R.B. stated that Ryan asked her if she knew how "to keep that area down there clean." R.B. thought it was inappropriate for Ryan to ask her about that and told him that if she had any questions about the subject, she would ask her mother, not him. Also in the video, R.B. described the incident when Ryan came into the bathroom while she was taking a shower, the time when she had to call the police because Ryan "was choking and hitting my brother and kicking him and all of that stuff," and the times when Ryan would throw things. Once, R.B. recalled, Ryan threw a "baby swing" at her. When asked if anyone was ever hit when Ryan was throwing things, R.B. explained,

---

[2] Ryan was 24 years old at the time of the termination trial. Shannon was 36 years old. Although they have shared a common surname since before the termination suit was filed and were living together for approximately five years prior to the termination hearing, Ryan and Shannon did not ceremonially marry until sometime after the suit was filed in August 2008 and before the termination hearing in July 2009.

He's hit me with a couple of things. Like he'll throw like minor stuff at me because he knows if he leaves a mark on me it will tell like automatically. But like my mom, he'll throw like glass plates and stuff at her while she's doing dishes and stuff, and it gets on the floor and then the babies come in. It's a miracle they haven't cut their feet open, . . .

The jury also heard testimony from K.W., who testified via video remote broadcast. When asked if Ryan had done something to her that she "didn't like," K.W. began crying. Then, after K.W. calmed down, she testified, "He molested me." K.W. recalled that Ryan showed her "his private part" on "one or two" occasions and asked her "to touch it." K.W. testified that she was "either six or seven" when this happened the first time. The second time it happened, when K.W. was seven or eight years old, she was taking a bath when Ryan allegedly came into the bathroom, took her hand, and placed it on his sexual organ for approximately one minute. According to K.W., he told her "that it was some kind of test," and he then left the room. K.W. also testified that Ryan "told me to keep it a secret" and made her feel scared about telling anyone. Additionally, when asked if Ryan ever touched her "private part," K.W. testified, "Yes." She added that this happened "a few times." K.W. also remembered being in the bedroom with R.B. when Ryan came into the room "with just his underwear on and with his private part hanging out." When asked how many times this happened, K.W. testified that it happened "five or six" times. During her testimony, K.W. was asked to draw a picture of a boy and draw a circle around the boy's sexual organ. K.W. did so. She was then asked to draw a picture solely of the male sexual organ. She again did so. Both drawings were admitted into evidence.

K.W. testified that she did not tell her mother what had happened "because I knew she wouldn't believe me." K.W. believed that her mother did not love her or her siblings and cared

more about Ryan than them. As one example of this, K.W. pointed to Shannon's behavior when Ryan was allegedly violent toward John. According to K.W., "Ryan would either punch him in the ribs or give him a bloody mouth or choke him" and Shannon "barely tried to hold Ryan back." When asked if she wanted to see her mother at that time, K.W. testified, "I don't think ever."

The jury also heard K.W.'s videotaped interview with the Children's Advocacy Center, a transcript of which appears in the record. In the video, K.W.'s description of Ryan's behavior was largely consistent with her courtroom testimony, with several additional details. In the video, K.W. stated that Ryan made her look at his penis on four occasions, including once in Ryan's bedroom. K.W. also said that it felt "a little hard" the two times that Ryan made her touch it. Additionally, K.W. explained on the video that Ryan touched her vagina two times. One time Ryan did so, K.W. stated, was to examine a rash that she had, but the second time he did so, according to K.W., she did not have a rash. On this occasion, K.W. stated, Ryan touched the "inside" of her vagina. K.W. also explained that Ryan "throws things" at her and her sister when they make him mad and that she was afraid to say anything about Ryan's behavior out of fear that he "might come after me" and "punch me and lots of stuff."

A psychological evaluation of K.W. was admitted into evidence. In the evaluation, Dr. William Lee Carter, a psychologist, made the following diagnostic findings and conditions, among others:

> [K.W.] identified her stepfather "Ryan" as the instigator of most family problems and implicated her mother for being non-protective and aligned with the stepfather. [K.W.] feels hurt that her mother would choose her husband over her children. There are psychological signs of anxiety and depression subsequent to presumed mistreatment and abuse. . . .

11

Dr. Carter then made the following recommendation, among others: "[K.W.]'s stated and implied concerns about abuse and neglect within her family of origin should be taken seriously. While this examiner obviously cannot definitively conclude that she is a sexually abused child, there is sufficient reason to proactively assure her safety from harm."

The first person to whom K.W. reported Ryan's behavior was Melissa Reese, a friend of the Sylvias. For several months in 2006, the Sylvias had lived with Reese and her husband at the Reeses' house in Killeen. Even after the Sylvias had moved out of the house, the children would often stay with the Reeses when Ryan and Shannon were out of town. Reese testified that during one such stay, in August 2008, K.W. approached Reese and asked to speak with her privately. Reese agreed and accompanied K.W. to a bedroom. There, Reese explained, K.W. told her about what Ryan had done to her: "And she said, 'You know that thing that boys have?' And I said, 'A penis?' And she started crying. And she said, 'Mommy won't believe me, and Ryan will beat me.'" Reese continued,

> And I said, [K.W.], it's okay, just tell me what you need to tell me. I'll believe you. Just tell me the truth, tell me what you want to tell me. She said—she was crying. She was very upset. She said, "When I get in the bath, Ryan will come in there and he'll show it to me and make me touch it." And at that point I completely—I got very upset. I flipped out. I called my husband. I was like, you know, "What should I do first?" And he said, "Call the police." And we called the police. They came and took a statement, and then later I called CPS and told also what she had told me.

Reese also testified about an incident during which, she claimed, Ryan had exposed himself to her. Reese recalled that, while her husband was working in Alaska, Ryan came over to her house to do some maintenance work. At that time, Reese explained,

12

[H]e started talking about how he wasn't happy with Shannon and he wished he could be with someone more his age and with someone who didn't already have kids that were holding him down. He told me he wished he had never had the kids with her. And this eventually got to [him] telling me he wanted to sleep with me. And he was like, you know, will you tell me what you think about it—meaning his penis. And I was like, you know, I have no interest in it. I'm married. I—whatever. And so I turn around and he had it out.

And he's like, "Well, what do you think?" And he kept showing it to me. I would turn around, he would be at my house and he would show it to me. I told my husband, and my husband knew from the very beginning. I would tell him to stop showing me and he wouldn't.

Reese claimed that this happened "between five and ten times" over a period of approximately two days. Eventually, Reese testified, her husband "sent [Ryan] a message on MySpace saying please stop showing my wife your penis, and he did."

However, according to Reese, at one point before Ryan stopped, Reese had asked Ryan if she could take a picture of his penis. Reese testified that Ryan agreed. Reese explained that she did this in order to have proof for both her husband and Shannon of Ryan's behavior. Reese testified that, when she told Shannon what Ryan had done, Shannon "wasn't surprised. She acted like, you know, that's what happened, that's okay." Reese added, "She told me that he had shown his penis to somebody else to see what they thought about it also." When asked who this person was, Reese testified, "It was a lady [who] they lived with between the two times they lived with me while they were living with their friend Misty." Reese did not otherwise elaborate on this person's identity.

Registered Nurse Lindsey Stonebrook, a Sexual Assault Nurse Examiner (SANE), examined K.W. for signs of sexual abuse. Stonebrook testified that she found no evidence of

penetration on K.W. but that this was not unexpected in the case of a touching: "You don't always see injury or trauma from just touching or even penetration because everybody's . . . body is different, so you don't always see injury even if there was penetration or touching." The written SANE report was admitted into evidence, including a summary that K.W. had written in response to Stonebrook's inquiries about the alleged incidents with Ryan:

> Patient wrote, "When I was 7 or 8 Ryan came in the bathroom when I was taking a bath. He took out his pee part and made me look and hold it. Then another time just look. Then again just look one more time just look. . . ." Patient [was] asked if there was anything else she wanted to tell me. Patient states, "Everyday he would walk into our room (me and [R.B.]) with his pee part out. He said it would just fall out. He would do this everyday."

During the CPS investigation, psychological evaluations were performed on both Ryan and Shannon. Dr. Michael Campbell, a psychologist, performed the evaluations. Campbell testified that in his opinion, Ryan and Shannon's capacity to appropriately parent was "poor." Regarding Ryan, Campbell added, "His functional ability and motivation to meet his children's needs I felt like was poor also." Campbell's written psychological evaluation of Ryan was admitted into evidence. In the evaluation, Campbell wrote, among other things, that Ryan had an "elevated Lie subtest score." "Individuals with similar scores," Campbell explained, "present themselves in an overly positive light by attempting to create an unrealistically favorable view of their moral character and psychological adjustment. They are unwilling to admit even minor flaws and are making an unrealistic proclamation of virtue. They may be making an outright effort to deceive others about their motives or adjustment."

14

Campbell also testified that during his interview with Ryan, he "developed a sense" that Ryan "was not safe around children." One of the Department's theories at trial, which the Department attempted to develop through Campbell's testimony, was that Ryan was "grooming" K.W. for more extensive sexual abuse in the future. Campbell testified that grooming "is what perpetrators do in preparing a child for . . . further abuse. They set them up, so to speak, psychologically, emotionally . . . for further, more extensive sexual abuse." Campbell explained that in such cases, the sexual contact usually begins "pretty mild. It's not just a sudden violent sexual intercourse all of a sudden, but they build up to it with maybe fondling, touching, maybe first some exposure. It starts slow and gradually works on to . . . more blatant sexual acts."

Campbell further testified that Shannon did not believe that Ryan had abused her daughters. In fact, according to Campbell, Shannon was unable to consider the possibility that her daughters were telling the truth. Campbell considered this to be "very unusual." In Campbell's opinion, Shannon's devotion to Ryan was "pretty excessive." He explained, "[M]y diagnosis was that she had a dependent personality disorder and that she really needed his approval. She really needed to stick by him no matter what anybody said. She needed—needed to put . . . her relationship with him above that of her children." Campbell also opined that, if nothing changed in the Sylvia household, "the risk for further abuse was very high."

Campbell also performed a psychological evaluation on R.B. When asked if R.B. "seemed believable" to him, Campbell testified, "Yes, sir." Campbell also testified that R.B. was depressed and had other psychological issues, including an "elevated schizophrenia subtest score,"

15

that may have been the result of sexual abuse. Campbell's written psychological evaluation of R.B. was admitted into evidence.

Brenda Bearden, a licensed clinical social worker who worked with Dr. Campbell, conducted therapy sessions with Shannon. Bearden testified that she saw Shannon for a total of six one-hour sessions between September and November 2008. In those sessions, they discussed the allegations that Ryan had sexually abused her daughters. In "every single session," Bearden recalled, Shannon "was adamant that her husband could not have done that and that she believed that her daughter was lying." Bearden also testified that Shannon called her daughters "liars." The following testimony was elicited regarding Shannon's support of Ryan during the investigation:

Q:    Who did she blame for the problems regarding her and her husband?

A:    She blamed neighbors in the trailer park where she lived, she blamed CPS, pretty much anyone else that had anything to do with her—a friend [who] I don't remember the name of.

Q:    Was she able or did she waiver in her support of her husband at all?

A:    Not at all.

Q:    Was she totally supportive of him?

A:    Absolutely.

Q:    Was she even willing to accept that her daughters might be telling the truth?

A:    No.

Q:    Was she willing to accept at all that her husband may have sexually abused her daughters?

A:    No.

16

Q: Were any discussions made that her husband had admitted to exposing his penis on at least two occasions to her daughters?

A: No, she also denied that.

Bearden also testified that she had advised Shannon not to live with Ryan until the case was finished but that Shannon did not want to do that. This caused Bearden concern. "[W]hat I want a mom to do," Bearden explained, "is to pick her children over another adult," but Shannon did not appear willing to do so. Bearden explained, "My understanding is that she chose to stay with her husband and wait and see whether he was proven innocent or guilty and then her feeling was that the CPS case would be thrown out and her children would be reunited with her."

During Ryan's testimony, he admitted that on two occasions, his penis was out of his boxer shorts when he had walked into his stepdaughters' bedroom. However, he claimed that on both occasions, "it was an accident." He denied ever asking K.W. to touch his penis but admitted to touching K.W.'s vagina on one occasion, although he claimed that this was because K.W. had a rash and he needed to apply ointment to treat it. Ryan asserted that R.B. and K.W. were lying about these incidents because he was "a strict parent." He claimed that R.B. was upset that he would not let her have a boyfriend, and K.W. was upset because he had punished her for "beat[ing] on her younger siblings." Ryan also claimed that Melissa Reese had "manipulated" the children in retaliation for Ryan's refusal to "have sex with her." Ryan admitted to showing his penis to Reese but claimed that Reese had asked to see it. He denied that he had let Reese take a picture of it. Ryan also admitted that he was currently being charged with the felony offense of sexual abuse of a child. However, he claimed that he had been "falsely accused and set up."

17

Shannon testified that Ryan had informed her of the incident when he had walked into her daughters' bedroom wearing only boxer shorts. According to Shannon, Ryan "felt very bad about it. He came out and said that she might have saw, and he made sure after that he wore shorts." When asked how many times Ryan told her that this had happened, Shannon testified, "Well, he told me of the one [time], but I'm assuming he might have known the second [time]. But he was very worried about it . . . that it had happened, and he changed the way he dressed." When asked how the exposure could have happened "accidentally" a second time, Shannon did not directly answer the question. Instead, she explained that Ryan "would help take care of his children" at night and that sometimes one of the younger children would wake up in the middle of the night screaming, and Ryan would get out of bed to check on the child. Shannon added, "He sleeps in his boxers after he gets home from going to work. . . . I didn't know it was a crime to sleep in your underwear." When asked if it was appropriate for Ryan to apply ointment to K.W.'s rash, Shannon claimed that K.W. had asked her to have Ryan do it and that she had allowed Ryan to do it. Shannon recalled, "And I stood right there and I watched her. He did it the one day, that's all he did it. One morning, noon and night, and that's it." Shannon testified that she had been aware of her daughters' allegations against Ryan since August 2008, eleven months prior to the termination trial. When asked if she believed any of the allegations made by her daughters, Shannon testified that she did not. Shannon also claimed that her daughters were lying. When asked if there was a "one percent chance" that her daughters were telling the truth, Shannon testified, "Nope." When asked how a ten-year-old girl could have made up being told by Ryan that the touching was "a test," Shannon claimed that it was

"something maybe a 15-year-old would tell a ten-year-old to say or a 24-year-old by the name of Melissa Reese would tell her to say."

The following testimony was elicited concerning Shannon's persistent refusal to believe her daughters and the extent of Shannon's ongoing support of Ryan:

> Q: There's nothing that [K.W.] can say—there's no way she could say it that you would believe it.
>
> A: No.
>
> Q: So you stayed with him. You sleep with him.
>
> A: Uh-huh.
>
> Q: You got pregnant by him again.
>
> A: Uh-huh.
>
> Q: And you married him.
>
> A: Okay.
>
> Q: Right? Right?
>
> A: Yes.
>
> Q: All of this after the allegations were made.
>
> A: Yes.
>
> Q: And it never occurred to you one time that [you] might be wrong?
>
> A: Nope, because I'm always there.
>
> . . . .
>
> Q: But the point is you're asking to bring these little girls back into the home with you and your husband.

A: Yes.

Q: Right? Is that what you're asking for?

A: Yes, and not just my babies, all of my girls.

. . . .

Q: And it's never occurred to you, not one time, that you could be wrong?

A: Nope.

Several witnesses testified on behalf of Ryan and Shannon. Dr. Greg Hupp, a psychologist, conducted independent psychological examinations on Ryan and Shannon. His written evaluations of both parents were admitted into evidence. Hupp's overall assessment of Ryan was that he "appears to be a solid father with good judgment" and that he has "a history of stability both emotional, financial, and employment history, and also in terms of his relationship with his wife since he's been an adult, and there's no indication that—to question his judgment at this point." When asked how likely it would be that Ryan would commit the acts of which he was accused, Hupp testified, "Well, it's very difficult to predict future behavior. I can only go based on his past behaviors that he has demonstrated, and as an adult there's no indication of any inappropriate behaviors that I've seen or that were reported to me." Hupp recommended that Ryan's parental rights not be terminated.

Hupp made the same recommendation regarding Shannon's parental rights. Hupp "basically found that she was an intelligent woman with a good history of emotional stability, good academic skills, ability to set budgets and understand numbers and manage finances and that type

20

of thing." Hupp did not fault Shannon for believing Ryan and testified that "there was no indication that her attachment to her husband was any more extreme than any typical married couple."

Hupp was subjected to a vigorous cross-examination by the Department and the attorney ad litem concerning the bases for his findings and conclusions. Hupp admitted that he had no access to the CPS reports and no access to the testimony of R.B. and K.W. Hupp further admitted that if R.B. and K.W.'s allegations had been "substantiated"—he did not believe they were—he "would have to take that into consideration in coming up with my final findings."

Ryan's sister, 17-year-old S.G., and his mother, Lori Gildea, also testified. S.G. testified that she believed her brother to be a truthful person, that he loved his children, and that he was a good brother to her. Lori testified that she did not believe the allegations against Ryan, that she continued to support both Ryan and Shannon, and that she was willing to take custody of the children. When asked if she believed Ryan and Shannon's parental rights should be terminated, Lori testified, "No. I've always said that I don't think Ryan might be the ideal icon for a father, but he was 19. He voluntarily entered . . . into the relationship with Shannon. . . . I didn't approve of it. That's not what I would have expected, but that's what he chose. He's an adult."

Several witnesses who knew Ryan and Shannon provided brief testimony about the condition of the Sylvias' home and their observations regarding Ryan and Shannon's parenting. Vickie Baker, the property manager of the home where Ryan and Shannon currently live, testified that they were good tenants who always paid their rent on time and had made improvements on the property and kept it clean. Beverly Bunton, a neighbor of the Sylvias, testified that Ryan and Shannon "had a clean home," "are good parents," and "know how to . . . take care of each other and

their kids." Officer Daniel Deleon of the Harker Heights Police Department testified that Ryan and Shannon would often provide "information and assistance" when police officers would respond to disturbances in their trailer park. "When their son John Bennyhoff sometimes gets himself in trouble or things where I have to make contact," Deleon added, "they're always letting me inside the house." Deleon observed that "the house is pretty well kept. The kids are taken care of. Nothing to where I would have to make a contact for any type of neglect or abuse." Eric Rahn, a friend of the Sylvias, testified that when he would visit their home, it "looked lived in" and "they looked like good parents. It was sanitary. . . . There was nothing that would indicate any kind of negligence on their part." Rahn also testified that he did not believe the allegations against Ryan.

John Bennyhoff, the 18-year-old son of Shannon and stepson of Ryan, testified that he believed Ryan was "a good father," although he acknowledged that Ryan is "just starting off" and "hasn't had enough practice." When asked about the Department's allegations that he and Ryan would "fight with each other," Bennyhoff testified, "It's not like major fighting. It's just like, you know, just arguing and both of us getting mad at the same time." When asked if Ryan had ever hurt him, Bennyhoff testified, "Not really." Bennyhoff also testified that he had not observed Ryan do anything inappropriate to R.B. and K.W., and he believed that the allegations against Ryan were "not true."

On cross-examination, Bennyhoff admitted that, "every once in a while," the police had been dispatched to the Sylvia residence in response to "conflict" that arose between him and Ryan. Bennyhoff also acknowledged that he was in California at the time his sisters made their allegations against Ryan and that he had not talked to them concerning the allegations.

22

*Endangerment finding*

Ryan and Shannon contend that there is insufficient evidence to support a finding of endangerment. They argue that "the only evidence" against Ryan was the testimony of K.W. and R.B. and that both witnesses were motivated to lie about the alleged abuse. As for the evidence against Shannon, they argue that "supporting her husband and not separating herself from him" "is insufficient evidence that her rights should be terminated." We disagree.

The jury heard considerable evidence, including the testimony of both victims and their interviews with the Children's Advocacy Center, tending to show that Ryan had exposed himself to his stepdaughters on multiple occasions, forced the youngest one, 10-year-old K.W., to touch his sexual organ, and inappropriately touched K.W.'s sexual organ. Furthermore, Melissa Reese, the first person to whom K.W. reported the abuse, described an incident in which Ryan had exposed himself to her. Additionally, the jury heard evidence tending to show that Ryan was physically abusive to his stepson and "threw things" at Shannon and his stepdaughters. This and other evidence tending to show that Ryan was a perpetrator of sexual abuse, that he lacked self-control, and that he had a propensity for violence would allow a reasonable fact-finder to form a firm belief or conviction that Ryan had engaged in a course of conduct that endangered his children's physical and emotional well-being. *See In re L.C.*, 145 S.W.3d at 796; *In re J.I.T.P.*, 99 S.W.3d at 845; *see also In re W.J.H.*, 111 S.W.3d at 716 (evidence tending to show that parent abused one child can be used to support jury's endangerment finding regarding other children).

Ryan admitted that some of the incidents occurred, although he claimed innocent explanations for them (the exposures to R.B. were "accidents," the exposure to Reese was because

23

she "asked" to see it, the touching of K.W. was to apply ointment to a rash). Otherwise, Ryan denied the allegations against him and provided reasons why he believed R.B. and K.W. would be motivated to lie. However, the jury, as fact-finder, was entitled to disbelieve Ryan's denials, excuses, and explanations, particularly in light of Dr. Campbell's testimony regarding Ryan's propensity for deception. Similarly, the jury could have chosen to reject the opinions of Dr. Hupp, the expert witness called by Ryan and Shannon to refute Dr. Campbell's testimony, especially in light of the extensive cross-examination by the Department and the attorney ad litem.

As for the finding of endangerment regarding Shannon, the jury heard evidence that Shannon knew about Ryan exposing himself to R.B. but that Shannon believed the incidents were accidents. R.B. testified, "I told her occasionally, like I would bring it up in conversation, but she would always say it was like an accident or he was just, you know, trying to help out and stuff." Shannon also refused to believe K.W.'s allegations against Ryan and testified that she wanted to return all of her children to Ryan's home, where Shannon, by her own admission, continued to cohabitate with Ryan despite the allegations and evidence against him. Shannon also admitted that, after the allegations against Ryan were made, she had married and been impregnated by him, which, the jury could have reasonably inferred, further decreased the possibility that she would separate from him. According to Campbell, Shannon had "dependent personality disorder" and "really needed his approval. She really needed to stick by him no matter what anybody said. She needed—needed to put . . . her relationship with him above that of her children." Campbell also testified that, if nothing changed in the Sylvia household, "the risk for further abuse was very high." Brenda Bearden, the therapist who had counseled Shannon on six occasions, testified similarly about

24

Shannon's unwavering support of Ryan. In "every single [therapy] session," Bearden recalled, Shannon "was adamant that her husband could not have done that and that she believed that her daughter was lying." Moreover, R.B. testified and explained in her interview with the Children's Advocacy Center that Ryan would throw objects at Shannon and her daughters and physically abuse her son while Shannon was present but that Shannon did not take appropriate action to stop Ryan's violent behavior. This and other evidence would allow a reasonable fact-finder to form a firm belief or conviction that Shannon engaged in a course of conduct that endangered all of her children by refusing to protect them from situations that exposed them to a risk of abuse. *See In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.); *L.C.*, 145 S.W.3d at 797-98; *J.M.C.A.*, 31 S.W.3d at 697-98; *see also In re Baby Boy R.*, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (holding that evidence of abuse directed at one child allows jury to infer that parent "engaged in conduct that will endanger or jeopardize the physical or emotional well-being of other children in the home who may discover the abuse or be abused themselves").

We conclude that the above evidence is legally and factually sufficient to support an affirmative finding under section 161.001(1)(E) regarding both parents.

### Best interest finding

We must also determine whether the evidence is sufficient to support a finding that termination of Ryan and Shannon's parental rights was in the best interest of the children. *See Holley*, 544 S.W.2d at 371. The best interest of the children is assessed using a non-exhaustive list of factors. *Id*. at 372. These factors include the children's wishes, their emotional and physical needs now and in the future, emotional or physical danger to the children now and in the future,

25

the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the children by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *Id*. The Department need not prove all of the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the fact-finder from finding by clear and convincing evidence that termination is in a children's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the children's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). Permanence is of paramount importance in considering a child's present and future emotional and physical needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). A parent's statutorily offensive conduct is often intertwined with the best interest determination. *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

In addition to the above evidence regarding Ryan and Shannon's statutorily offensive conduct, the jury heard the following evidence regarding the best-interest determination. Lurene Tapia, the conservatorship caseworker for the children, testified that R.S., S.S., and T.S. had all been placed in the same foster home. According to Tapia, "it's a very good home," and the foster parents were interested in adopting all three children if the Sylvias' parental rights were terminated. Tapia also explained that K.W. had been placed with K.W.'s great grandmother, Georgette French, and

26

that K.W. "is extremely happy in her home."  Tapia testified that French was emotionally attached to K.W., that she wanted to adopt her, and that, in her opinion, the adoption would be in K.W.'s best interest.

Tapia further testified that termination of the Sylvias' parental rights was in the best interest of the children.  Tapia claimed that neither parent had fully cooperated with the Department during the investigation.  Ryan had stopped going to court-ordered therapy after approximately two months, refused to take a psychosexual evaluation, and did not pay court-ordered child support.  Shannon also did not pay court-ordered child support and, although she attended therapy for approximately two months, her therapy was ended shortly thereafter because she was not making any progress.  According to Tapia, Ryan's abusive behavior and Shannon's inability to protect her children from Ryan's abuse caused her "extreme" concern and played an "extreme" role in the Department's recommendation to terminate their parental rights.

Denise Demorest, the foster mother of R.S., S.S., and T.S., also testified.  Demorest testified that she has been married for 21 years to Richard Demorest; she is 44 and he is 42.  Both of them, Demorest testified, were in good health.  Demorest also testified that Richard works for the military, she is a "stay-at-home wife," and they have two grown children of their own, a 25-year-old son serving in the Navy and a 23-year-old son who has graduated from college and owns two businesses.  They also have a 13-year-old dog who is a "lab/shepherd mix."  According to Demorest, she and her husband get along "very well" with R.S., S.S. and T.S., and she and her husband "very much" want to adopt the children.  When asked if she had any reservations or

hesitation about this, Demorest testified, "No, none whatsoever." Demorest's husband Richard testified similarly about their willingness to adopt the children.

Georgette French, K.W.'s great grandmother, also testified. French testified that K.W.'s father, Jeremiah Warner, is her grandson. French lives in Virginia and was 71 years old at the time of the termination trial. According to French, she and K.W. "get along great," and she is willing to adopt K.W. if the Sylvias' parental rights are terminated.

We conclude that the above evidence is legally and factually sufficient to support the finding that termination was in the best interest of the children. Regarding the best interest of K.W., the jury heard evidence that K.W. desires to remain with French, does not want to see Shannon "ever" again, and is afraid of Ryan and what he might do to her. Lurene Tapia, the conservatorship caseworker for the children, testified that K.W. "is extremely happy in her [new] home" and that French was emotionally attached to K.W. In Tapia's opinion, the adoption would be in K.W.'s best interest. The jury also heard French testify that she and K.W. "get along great" and that French wants to adopt K.W. Regarding the best interest of R.S., S.S., and T.S., the jury heard evidence that all three children had been placed in the same foster home, that it was "a very good home," and that the foster parents wanted to adopt all three children. The jury also heard evidence regarding the stability of the proposed placement, including testimony from both foster parents explaining their past success with raising children. Furthermore, Tapia testified that termination was in the best interest of the children because neither Ryan nor Shannon had fully cooperated with the Department during the investigation and had not been willing to do all that was required of them

28

in order to regain custody of their children. And, as we have already explained, the jury heard considerable evidence regarding Ryan and Shannon's statutorily offensive conduct.

The evidence disputing the finding that termination was in the best interest of the children consists primarily of the testimony of Ryan denying the allegations against him, Shannon claiming that, despite believing that her daughters were "liars," she still loved them, and the other witnesses called by Ryan and Shannon who claimed that, in their opinion, Ryan and Shannon were "good parents" and recommending that their parental rights not be terminated. Giving due consideration to the above evidence that the fact-finder could reasonably have found to be clear and convincing, we cannot say that the disputed evidence renders the evidence supporting the best-interest finding factually insufficient.

The evidence was legally and factually sufficient to support termination of Ryan and Shannon's parental rights. We overrule their first issue.

**Evidence admissibility**

In their second issue, Ryan and Shannon contend that the district court abused its discretion in admitting certain evidence concerning Ryan's childhood history, including an alleged juvenile adjudication for the offense of aggravated sexual assault committed against his sister that apparently resulted in Ryan being incarcerated in a juvenile facility, and evidence that Ryan had been sexually abused as a child.

The challenged evidence first appears in Dr. Campbell's psychological evaluation of Ryan. In the "history" section of the report, Dr. Campbell wrote that Ryan "believes that he is a product of rape." Then, in the "special preoccupations" section, Dr. Campbell writes,

29

He reported a history of sexual abuse. He reported his biological father was sexually abusive toward him. However, the abuse occurred while he was still young enough to be in diapers. He claimed to recall observing his uncle and father sexually abusing other people. He also claimed to recall his father bringing women into the house to sodomize him. . . .

Counsel objected to the above evidence and sought to have it redacted from the report, but the district court overruled the objection. The Department did not elicit any testimony from Dr. Campbell regarding the above history. However, before his report was admitted, Dr. Campbell was asked if being abused as a child is "an indicator of what the person will be like as an adult." Campbell testified, "People, especially men, who were sexually abused as a child or as children are highly predisposed to become abusers of children."

Next, over objection by counsel, R.B. testified concerning an incident between Ryan and Ryan's younger sister that had allegedly occurred when Ryan was 12 years old and his sister was five years old. R.B. claimed that Ryan had told her that "he was arrested when he was younger for doing something with his little sister." R.B. testified as follows:

He—well, his side of the story was that he—he had to take her to the bathroom because, I guess, she was real young. I don't know how much younger he is than her [sic]. But she had to go to the bathroom or whatever and it was late or something, so he was wiping her or something and his uncle was drunk and he walked in and said that he was touching her and stuff like that.

According to R.B., Ryan told her that as a result of this incident, "he was in juvie for a while." This was the extent of R.B.'s testimony concerning the allegation. No court documents verifying the existence of the alleged juvenile adjudication were ever admitted into evidence.

The Department returned to the subject during its cross-examination of Ryan and Shannon's expert witness, Dr. Hupp. In his preliminary evaluation of Ryan, Hupp included the following history:

> [Ryan] reported that he was the product of a rape that his mother decided to keep. Ryan's father had sexually abused him at the age of 2. . . . Ryan vividly remembers being locked in a closet where he would hear his older brother being sexually molested by his father. . . . Reportedly, Ryan's father was never prosecuted for his sexual behaviors. . . . At the age of 12, [Ryan] was sent to a juvenile detention facility for reported aggravated sexual assault against his sister. However, Ryan claimed that his mother had alleged this in order to "get me the help I needed" so that he could be incarcerated and placed [in] a treatment facility. Ryan remained at the juvenile detention facility for about three and a half years until he was transferred to an independent group home . . . . During his incarceration, Ryan had spent three years in a sexual offender program in a program for the sexually abused.

Hupp's preliminary evaluation was admitted into evidence over objection by counsel. Additionally, over a running objection by counsel, the Department asked Hupp numerous questions concerning the above history. One such question was whether Hupp agreed with Campbell's opinion that a person who has been sexually abused as a child has "a greater propensity for sexually abusing as an adult." Hupp testified, "That's pretty well established, yes."

To rebut the evidence regarding the alleged juvenile adjudication, counsel for Ryan and Shannon asked Ryan's sister and mother to explain the incident. Ryan's sister, S.G., testified that her uncle had walked into the bathroom, saw Ryan putting a towel around her after she had taken a bath, and claimed that Ryan was "groping" her. S.G. denied that Ryan had done so. Rather, S.G. claimed, "He put a towel around me after he helped me out of the bathtub. Because I was, as you can tell, I'm short, and I was small then, and the bathtub was about this high off the ground . . . . So

31

he was helping me out of the bathtub because someone actually had to lift me out to get out." S.G. recalled that her mother "thought it was like something going on, but it wasn't. It came out later on that nothing happened. No one believed me. They said because I was too young, I didn't know what happened." Ryan's mother, Lori Gildea, provided similar testimony explaining what had happened and claimed that she had reported the incident to the police simply as a precautionary measure—she was "trying to prevent something from happening" in the future, and she wanted Ryan to get "all of the help that he needs."

Ryan and Shannon contend on appeal, as they did at trial, that the evidence concerning Ryan's childhood was more prejudicial than probative and that it violated the prohibition against admission of evidence concerning juvenile adjudications. *See* Tex. R. Evid. 403, 609(d); *see also* Tex. Fam. Code Ann. § 51.13(a) (West 2008) (providing that "an order of adjudication or disposition in a proceeding under [the juvenile justice code] is not a conviction of crime" and "does not impose any civil disability ordinarily resulting from a conviction"), (b) (listing proceedings in which evidence of juvenile adjudication may be used; proceedings to terminate parental rights not included in list). In response, the Department argues generally that the evidence was relevant—that it tends to show "a continuing pattern of sexual abuse of children by Ryan Sylvia" and that termination of Ryan's parental rights was in the best interest of the children. *See Boyd*, 727 S.W.2d at 534 (holding that evidence of imprisonment may be used to support finding of endangerment); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.) (holding

that evidence of juvenile adjudications for aggravated sexual assault may be sufficient to support finding of endangerment if evidence "shows a present and future danger to the child").[3]

Assuming without deciding that the district court should not have admitted the challenged evidence, we cannot conclude on this record that Ryan and Shannon were harmed by its admission. In their brief, Ryan and Shannon ask us to apply the harm analysis used in *Murphy v. State*, a 1993 criminal case in which the appeals court held that the trial court erroneously admitted evidence of a juvenile adjudication during the punishment phase of trial. *See* 860 S.W.2d 639, 644 (Tex. App.—Fort Worth 1993, no pet.). The appeals court then applied former rule of appellate procedure 81(b)(2), which provided: "If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." *Id*. The appeals court concluded that the error was harmful "because we cannot determine beyond a reasonable doubt that the error did not contribute to the punishment." *Id*.

That is no longer the standard of review used for assessing the harm of evidentiary errors in criminal cases, *see* Tex. R. App. P. 44.2(b), and it has never been the standard used in civil cases. In civil cases, "reversal is warranted only if the error probably caused the rendition

---

[3]   There was no contention in *K.M.M.* that the admission of the juvenile adjudications violated either rule 403 or 609(d). Instead, the appellant—who, unlike Ryan, was incarcerated for his juvenile offenses at the time of the termination hearing—argued that "the conduct for which he is incarcerated occurred over three years prior to the termination hearing and was, therefore, too remote to support termination of his parental rights." *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). We note that in this case, the conduct of which Ryan was accused as a juvenile occurred over 12 years prior to the termination hearing.

33

of an improper judgment." *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *see* Tex. R. App. P. 44.1(a)(1). "[W]hether erroneous admission is harmful is more a matter of judgment than precise measurement." *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). "We review the entire record, and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted." *Id*.

Ryan and Shannon have failed to make such a showing. They assert that reversal is warranted because the Department and the attorney ad litem for the children "hammered" the evidence to the court, the witnesses, and the jury throughout the hearing and during final arguments. Specifically, they observe that the term "aggravated sexual assault" was used by the attorney ad litem in reference to Ryan and in front of the jury "at least seven times." "Therefore," Ryan and Shannon contend, "it is likely that the jury placed a great deal of weight on this evidence."

Again, however, that is not the standard for assessing harm. In civil cases, reversal is warranted only if the error "probably caused the rendition of an improper judgment." Tex. R. App. P. 44.1(a)(1). We have reviewed the entire record in this case and cannot conclude that the judgment terminating Ryan's parental rights "turned" on the challenged evidence. This does not appear to have been a close case. The jury heard considerable evidence concerning the nature of the current allegations against Ryan, which, Ryan admitted, had resulted in his being formally charged with the felony offense of sexual abuse of a child. This evidence included the testimony of R.B., a 16-year-old girl who testified that Ryan had walked into her bedroom when her mother was not at home and had exposed himself to her "around six" times; and K.W., a 10-year-old girl who testified that Ryan

touched her sexual organ "a few times" and, on "one or two" occasions, exposed himself to her while she was taking a bath and forced her to touch his sexual organ. At one point during K.W.'s testimony, the record reflects that K.W. began crying. Not only did the jury hear the courtroom testimony of these two girls, it also considered their videotaped interviews with the Children's Advocacy Center, which were largely consistent with their courtroom testimony but contained additional details concerning the alleged abuse. The jury also heard testimony from Melissa Reese, the family friend to whom K.W. first reported the abuse, and Lindsey Stonebrook, the SANE nurse who had examined K.W. and to whom K.W. also described the abuse. Reese also testified about an incident in which Ryan had exposed himself to her. Ryan, in his testimony, admitted to doing so (although he claimed that Reese had "asked" to see it). Ryan also admitted to exposing himself to R.B. two times (although he claimed that it was an accident both times) and touching K.W.'s sexual organ on one occasion (although he claimed that he did so to treat a rash). Additionally, Dr. Campbell interviewed R.B. and agreed that she "seemed believable." On the other hand, in his evaluation of Ryan, Campbell found that Ryan had an "elevated Lie subtest score" which indicated to Campbell that Ryan was deceptive. Also, in the psychological evaluation of K.W. that was admitted into evidence, Dr. Carter wrote that K.W. exhibited "psychological signs of anxiety and depression subsequent to presumed mistreatment and abuse," and, although he "cannot definitively conclude that she is a sexually abused child, there is sufficient reason to proactively assure her safety from harm."

Moreover, Ryan and Shannon have failed to show how the challenged evidence has any bearing on the evidence tending to show that, apart from the sexual allegations, Ryan was a violent man who threw objects at his wife and stepdaughters and got into physical altercations with his stepson. According to K.W., "Ryan would either punch [John] in the ribs or give him a bloody mouth or choke him." R.B. added that Ryan would sometimes kick John. Although Ryan's stepson denied these allegations, he acknowledged that he and his stepfather "argued" and "got mad" at each other and that the police had been called out to the residence in response to these "conflicts." Ryan's allegedly violent behavior made K.W. afraid that, if she told anyone about what he had done to her, he "might come after me" and "punch me and lots of stuff."

Nor can we conclude on this record that the judgment terminating Shannon's parental rights turned on the challenged evidence. As we have already explained, the Department's case against Shannon was based on evidence tending to show that she refused to believe her daughters' outcries or even entertain the possibility that they could be telling the truth and that, despite the evidence against Ryan, she remained with her daughters' alleged abuser, continued to sleep with him, got pregnant by him, married him, and desired to return all of her daughters to his home.

Ryan and Shannon have failed to show that the admission of the challenged evidence "probably caused the rendition of an improper judgment." Accordingly, we cannot conclude that they were harmed by the admission of the evidence.

We overrule Ryan and Shannon's second issue.

36

## CONCLUSION

We affirm the termination order.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:  April 15, 2010